**Walter SANDS and Edith L. Sands, Appellants,**

**v.**

**JAMES CLINIC AND ASSOCIATES, INC., Respondent.**

**No. 13185.**

Missouri Court of Appeals, Southern District, Division One.

April 4, 1984.

James J. Logan, James F. Koester, Inc., St. Louis, for appellants.

Clinton B. Roberts, Roberts & Roberts, Farmington, and J. Max Price, Price & Berger, Salem, for respondent.

CROW, Judge.

Around noon on Saturday, May 12, 1979, James I. Sands, age 79, sustained an intertrochanteric fracture of his left femur in an examination room at a clinic operated by James Clinic and Associates, Inc., in St. James. He was taken by ambulance to a hospital, where he died at 5:51 a.m. the next day. His widow, Edith L. Sands, and his son, Walter I. Sands, sued the Clinic, alleging that James I. Sands sustained the fracture as a direct and proximate result of the Clinic's negligence, and that the injury "hastened and produced the death of James I. Sands."

The Clinic moved for summary judgment. The trial court granted the motion. Plaintiffs appeal. We reverse and remand.

The depositions on which the trial court relied show that James I. Sands was alone when the injury occurred. The last person to see him before the injury was William W. Cottingham, an osteopathic physician.

According to Cottingham, James I. Sands had come to the Clinic on the morning of May 12, complaining that he was unable to sleep. He had asked "to have his heart checked" while there.

Cottingham examined Sands in the examination room, then departed, leaving Sands there alone. Cottingham did not say where Sands was positioned when Cottingham left the room, or what Sands was doing.

According to Cottingham, he heard Sands fall three or four minutes later.

Cottingham entered the room, finding Sands on the floor, his head by the door. There was an examination table near the door; however, Cottingham was not asked where Sands lay with respect to the table, and Cottingham volunteered nothing in that regard.

Cottingham did not recall asking Sands what had happened, or receiving any explanation from Sands. Sands did, however, complain of pain in the hip.

Sands' grandson, who had brought Sands to the Clinic, saw Sands on a stretcher outside the examination room, minutes after the injury. The grandson asked what had happened. According to the grandson, Sands said they let him fall off the examining table.

The petition alleges the fracture occurred when Sands "was allowed and permitted" to fall from the table to the floor. The plaintiffs charge the Clinic with negligence in three respects: (1) failure to order and provide proper restraints to prevent Sands from falling from the table, (2) failure to provide proper supervision to prevent Sands from removing himself from the table, and (3) failure to warn Sands of the danger of falling from the table.

In its order granting summary judgment, the trial court ruled that Sands' statement to his grandson about falling off the table was inadmissible because it was not part of the res gestae. Noting that the statement was in response to the grandson's question, the trial court concluded the statement was not spontaneous.

Finding no other evidence that Sands had fallen from the table, and observing there was testimony that Sands was physically active and "able to get around all right," the trial court pronounced the evidence insufficient to make a submissible case. Declaring that the pleadings, depositions and admissions on file showed there was no genuine issue as to a material fact, the trial court held the Clinic was entitled to judgment in its favor as a matter of law.

The principles governing our review are set out in *First National Bank of St. Charles v. Chemical Products, Inc.,* 637 S.W.2d 373, 375[1–4] (Mo.App.1982). In ruling on a motion for summary judgment, the trial court and the appellate court must scrutinize the record in the light most favorable to the party against whom the motion for summary judgment was filed and against whom judgment was rendered, and must accord to that party the benefit of every doubt. Summary judgment is a drastic remedy and is therefore inappropriate unless the prevailing party has shown by unassailable proof to be entitled thereto as a matter of law. If a genuine issue of fact exists, summary judgment cannot be granted. A genuine issue of fact exists when there is the slightest doubt about the facts. However, the fact in doubt must be a material one which has legal probative force as to a controlling issue.

In their briefs, the parties focus considerable attention on whether the trial court was correct in ruling Sands' statement to his grandson inadmissible. We need not, however, decide that issue in order to resolve the appeal.

According to Cottingham, Sands had undergone therapy for congestive heart failure as far back as January, 1977. At the time of the subject incident, Sands was on medication (digoxin and hydrochlorothiazide) for cardiac arrhythmia and the congestive heart failure. He was also taking medication for osteoarthritis. Another physician at the Clinic had previously diagnosed Sands as having arteriosclerotic heart disease, and Cottingham had listed Sands as having hypertensive heart disease. Cottingham explained that those two conditions "are very close, first cousins."

When Cottingham examined Sands on May 12, Sands had "compensated heart failure." Cottingham testified, "That means that under his therapy, although he had heart failure it was under fair control on his medical regimen."

Asked what was the cause of Sands' death, Cottingham replied, "It was presumed to be ventricular fibrillation as the primary etiology of the left ventricular

heart failure. Chronic atrial fibrillations. Hypertensive heart disease. Contributing cause intertrochanteric fracture of the left femur."

The Clinic's primary argument in support of the judgment below is that because James I. Sands was "quite capable of taking care of himself," the Clinic had no duty to provide restraints, supervision or warnings to protect him from falling off the table. The Clinic tenders this theory unsupported by citation of authority.

■ On the meager record before us, we are unable to declare as a matter of law that none of those duties were owed Sands. There is no evidence as to the distance from the table surface to the floor, the width of the table, or whether the table was equipped with a step, as some examination tables are. There is likewise no evidence whether Sands required assistance in getting onto the table (assuming that is where Cottingham examined him).

We do not know whether Sands had to lie down on the table, nor do we know how much, if any, of his clothing he had to remove to be examined. There is no testimony as to whether Sands was fully clothed at the time Cottingham found him on the floor. As observed earlier, we cannot determine whether Sands was on the table when Cottingham left the room. If he was, no one can tell from this record whether Sands was upright or prone. Indeed, there is no explanation as to why Sands was still in the examination room when the injury occurred. According to Cottingham, he had completed the examination at the time he stepped out. Why Sands remained there another three or four minutes is consigned to speculation. Cottingham admitted he did not know what Sands was doing during that interval, and it appears that no one entered the room to find out.

Neither side cites a Missouri case in which an outpatient has been injured by falling off an examination table at a physician's office or clinic, and we are unable to find one. There are, however, Missouri cases involving injuries to hospital patients who, while unattended, have either fallen from bed or fallen after leaving bed. *Robbins v. Jewish Hospital of St. Louis*, 663 S.W.2d 341 (Mo.App.1983); *Howard v. Research Hospital and Medical Center, Inc.*, 563 S.W.2d 111 (Mo.App.1978).

*Robbins* and *Howard* are remarkably similar. In each, a nurse had concluded that the patient should not be allowed out of bed without assistance, and in each the fall caused a fractured hip. In *Robbins*, the theory of negligence was failure to raise the side rails on the patient's bed; in *Howard*, it was failure to properly restrain the patient by a restraining device or failure to provide adequate supervision. In *Robbins*, the patient was being treated for drug overdose. She had a history of prior brain damage resulting in lameness and muscle spasms in her left leg for which she required a leg brace, weakness on her left side and arm, and impaired vision. In *Howard*, the patient, age 76, was pale, weak and dizzy when admitted to the hospital, and was given sleeping medication prior to the fall.

Both *Robbins* and *Howard* held that the plaintiffs made submissible cases of negligence without expert testimony as to whether the hospital was negligent in the respects charged.

Admittedly, *Robbins* and *Howard* are dissimilar to the instant case, in that James I. Sands was an outpatient, and was apparently in better condition than the patients in those cases. Sands was, however, of advanced age, and, according to Cottingham, was afflicted by the ailments recited earlier. Given the factual uncertainties surrounding Sands' fall, we are unable, on the fragmentary evidence before us, to acquit the Clinic of negligence as a matter of law. Accordingly, we reject the Clinic's primary argument.

Secondarily, the Clinic argues that the "undisputed physical facts show the fall occurred at the examination room doorway and not at the examination table." This contention, in our view, ignores Cottingham's testimony that the table was "two

and a half or three feet" from the door. Depending on how the table was situated with respect to the door, it is possible that Sands, after the fall, was close to the table, and in a position consistent with having fallen from it. The scant information supplied to the trial court, and to us, scrutinized in the light most favorable to the plaintiffs, falls short of unassailable proof that Sands did not fall off the table. Bearing in mind that the issue is not whether the evidence shows that Sands fell off the table, but instead whether it shows beyond the slightest doubt that he did not, we find the Clinic's second argument unpersuasive.

Summary judgment in favor of the Clinic cannot be sustained on this record. The judgment is reversed and the cause is remanded.

GREENE, C.J., and TITUS, J., concur.

FLANIGAN, P.J., recused.